# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————

**No. 95-40708**

———————————————

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**JOHN LIPARI; MARCELLO NANDO DEROSA,**

**Defendants-Appellants.**

—————————————————————————————————————

**Appeal from the United States District Court
for the Southern District of Texas
(C-95-CR-45)**

—————————————————————————————————————

May 12, 1997

Before JOLLY, JONES and WIENER, Circuit Judges.

EDITH H. JONES, Circuit Judge:[*]

Appellants John Lipari and Marcello Nando DeRosa appeal their convictions and sentences after a jury found them guilty of aiding and abetting in the possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C.

---

[*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

§ 2 ("Count 1") and conspiracy to possess with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 846 ("Count 2"). Finding no reversible error below, we affirm.

## FACTUAL BACKGROUND

In early 1994, Jesus Vasquez ("Vasquez") met with Francisco Villalobos ("Villalobos") and offered to pay him $40,000 to transport 100 kilograms of marijuana from Texas to Michigan. Villalobos conveyed this information to his long-time friend, appellant Marcello Nando DeRosa ("DeRosa"). The two decided to pay someone else $10,000 to transport the contraband, and Villalobos and DeRosa would then split the remaining $30,000 between themselves.

DeRosa contacted his friend, appellant John Lipari ("Lipari") because he knew that Lipari worked as a horse trainer at a ranch and had access to a horse trailer that would be suitable for transporting the marijuana. After discussing the prospective drug transaction with DeRosa, Lipari contacted Barry Coplin ("Coplin") and asked Coplin if he would be interested in transporting the marijuana from Texas to Michigan for $10,000. Coplin agreed. He, Lipari, and Coplin's fiancée Maria Clowers ("Maria") then drove to DeRosa's home in California where they agreed that Coplin would drive to McAllen, Texas, pick up the marijuana, and transport it in a horse trailer provided by Lipari to Lansing, Michigan.

To carry out the plan, Coplin rented a pickup truck and picked up the horse trailer at the ranch where Lipari worked. He then drove to a shopping center parking lot near DeRosa's house, unhooked the horse trailer, and left it there. Later that evening, Coplin, DeRosa, and Villalobos met in the parking lot to examine the trailer. The three men estimated that the trailer would hold approximately 300 pounds of marijuana beneath the floorboards.

2

At that time, Villalobos agreed to make the trip to Texas with Coplin and to pay for all expenses along the way. DeRosa gave Coplin approximately $500 in cash for Coplin's family's expenses during Coplin's absence. The men agreed that Coplin would contact DeRosa once he arrived in Michigan with the marijuana. The plan was that once they arrived in Michigan, Villalobos would pay Coplin his $10,000 "transportation" fee.

Coplin and Villalobos drove to Texas to pick up the load of marijuana. DeRosa remained in California. After they had acquired the marijuana, Villalobos and Vasquez decided that Coplin should be accompanied by a woman on the drive to Michigan to look less suspicious at the border patrol checkpoint at Fulfurrias, Texas. Coplin asked his fiancée Maria if she would be interested in riding. She refused, but agreed to contact her ex-sister-in-law Sherrie Clowers ("Sherrie") who agreed to accompany Coplin to Michigan. DeRosa purchased an airline ticket to Texas for Sherrie and gave her money for food on her trip.

On March 24, 1994, as Coplin and Sherrie began their drive to Michigan, Villalobos and Vasquez drove ahead of them in a rental car to inspect the checkpoint to see if it looked safe for the drugs to travel through. After being satisfied that it was safe, Villalobos called Coplin's pager indicating that it was safe to proceed. Villalobos and Vasquez then drove to a rest area just south of the checkpoint and watched until they saw the trailer drive by. Villalobos and Vasquez then returned to McAllen, Texas where Villalobos caught a flight to Lansing, Michigan to await the arrival of the marijuana. However, unbeknownst to Villalobos and Vasquez, Coplin and Sherrie were arrested at that checkpoint.[1] Upon his arrest, Coplin gave a statement to the police.

---

[1] Sherrie was released shortly after her arrest and returned to California.

3

Villalobos became concerned when Coplin failed to arrive in Michigan and contacted DeRosa, but DeRosa had not yet heard from Coplin. After waiting another day for word from Coplin, Villalobos flew back to California where DeRosa informed him that Coplin had been arrested and was cooperating with the authorities, and that the police were looking for Villalobos. Villalobos immediately fled to Tijuana, Mexico and again contacted DeRosa. DeRosa met Villalobos in Tijuana and reiterated to Villalobos that Coplin had "snitched" to the police.

On May 31, 1994, Lipari contacted San Diego police officer Ronald Shankles. During an interview between Lipari and Shankles, Lipari implicated DeRosa in the crime. On July 31, 1994, Officer Shankles and another officer interviewed DeRosa. During that interview, DeRosa implicated Lipari in the crime. On March 8, 1995, a grand jury indicted Lipari, DeRosa, and Villalobos.

On the morning of Lipari's and DeRosa's trial, Villalobos pled guilty to the conspiracy count pursuant to a plea agreement with the government and became the government's primary witness. DeRosa moved for a continuance on the basis of surprise; the judge denied the motion.

After a two-day trial, Lipari and DeRosa were found guilty of both counts of the indictment. Lipari was sentenced to 63 months of imprisonment, to be followed by five years of supervised release, a $500 fine, and a $100 mandatory special assessment. DeRosa was sentenced to 108 months of imprisonment, to be followed by five years of supervised release, a $1000 fine, and a $100 mandatory special assessment. Both Lipari and DeRosa appeal asserting several grounds of error.

**DISCUSSION**

A. SUFFICIENCY OF THE EVIDENCE

DeRosa asserts that there was insufficient evidence to sustain his conviction for Count 1; Lipari complains that there was insufficient evidence to sustain his convictions for both counts. Because neither DeRosa nor Lipari filed a motion for a judgment of acquittal pursuant to FED. R. CRIM. P. 29, we restrict our review of their claims to consideration of whether their convictions resulted in a "manifest miscarriage of justice."[2] Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking.[3] In making this determination, we view the evidence in the light most favorable to the government.[4]

1. DeRosa

The evidence supporting DeRosa's conviction for aiding and abetting the possession with intent to distribute marijuana is sufficient if it establishes that DeRosa became associated in the criminal venture, participated in, and in some way acted to further it.[5] Generally, the same evidence will support both a conspiracy and an aiding and abetting conviction.[6]

---

[2] *United States v. Thomas,* 12 F.3d 1350, 1358 (5th Cir.), *cert. denied,* 511 U.S. 1095 (1994).

[3] *See id.* (relying on *United States v. Galvan*, 949 F.2d 777, 782-83 (5th Cir. 1991)).

[4] *See id.*

[5] *See United States v. Singh,* 922 F.2d 1169, 1173 (5th Cir.), *cert. denied,* 500 U.S. 938 (1991).

[6] *See id.*

At a minimum, the evidence established that DeRosa presented the drug deal to Coplin, introduced Coplin to Villalobos and vouched for his trustworthiness, advanced $500 to Coplin to pay for Coplin's family expenses during Coplin's absence, and bought the airline ticket to fly Sherrie to Texas so that she could ride with Coplin through the border checkpoint. The evidence is sufficient to support DeRosa's conviction.

2.      Lipari

Lipari argues that there is insufficient evidence to support his possession convictions because he lacked the requisite intent to aid and abet, did not seek to make this criminal venture succeed, and did not join the conspiracy. These claims are without merit.

The evidence established that Lipari understood that the purpose of the venture was to transport marijuana, participated in the planning meeting that took place at DeRosa's home, recruited Coplin into the venture, and acquired the horse trailer used to transport the marijuana. Whether or not Lipari was to be paid for his assistance and did voluntarily become part of the criminal transaction, it is easily inferred from this evidence that Lipari possessed the requisite intent. The evidence is sufficient to support his convictions.

## B.  RIGHT TO CONFRONTATION

DeRosa and Lipari argue that their convictions should be reversed because the district court erred in permitting the testimony of Officer Shankles regarding statements made by both DeRosa and Lipari -- each implicating the other -- in violation of *Bruton v. United States*.[7] In *Bruton*, the Supreme Court held that a defendant's Sixth Amendment right to confrontation is violated when (1) co-defendants are tried jointly, (2) one defendant's extrajudicial statement is used to implicate

---

[7]      391 U.S. 123, 88 S.Ct. 1620 (1968).

another defendant in the crime, and (3) the confessor does not testify at trial and thereby is not subject to cross examination.[8] However, a statement admitted in violation of *Bruton* may be harmless if the statement's impact is insignificant in light of the other evidence presented against the defendant.[9]

As Officer Shankles's testimony was admitted at their trial without objection, we review only for plain error.[10] Apart from Officer Shankles's testimony, the government presented testimony from Coplin, Villalobos, and Maria establishing that DeRosa and Lipari were directly involved in this conspiracy. Any error from the admission of the testimony of Officer Shankles regarding the statements of Lipari and/or DeRosa did not constitute plain error.

## C. CONTINUANCE

DeRosa and Lipari contend that the district court erred in denying DeRosa's motion for continuance after learning on the morning of trial that co-conspirator Villalobos planned to plead guilty and testify for the government. We review a district court's denial of a motion for continuance for abuse of discretion.[11] The district court abused its discretion if the denial of DeRosa's motion for continuance severely prejudiced his defense.[12]

The government attempted to negotiate plea agreements with Villalobos, DeRosa, and Lipari up to the date of trial. On May 31, during a final pretrial conference attended by DeRosa and

---

[8]     *See id.* at 126.

[9]     *See United States v. Kelly*, 973 F.2d 1145, 1150 (5th Cir. 1992) (relying on *United States v. Basey*, 816 F.2d 980, 1005 (5th Cir. 1987)).

[10]     *See United States v. Beaumont*, 972 F.2d 91, 95 (5th Cir. 1992).

[11]     *See United States v. Alford,* 999 F.2d 818, 821 (5th Cir. 1993).

[12]     *See id.*

7

Lipari, the government revealed that it was likely that Villalobos would plead guilty and testify against Lipari and DeRosa at their trial. The district court then addressed the attorneys for DeRosa and Lipari:

> THE COURT:   ... And if, Mr. Burns [DeRosa's trial counsel], Mr. Daniele [Lipari's trial counsel], things take a turn that this gentleman has a plea that might impact on the two of your clients, would that make a difference in your trial on Monday?
>
> MR. BURNS:   It shouldn't, Your Honor.
>
> THE COURT:   Okay.

On the morning of the trial, counsel for DeRosa learned that Villalobos had indeed entered into a plea agreement with the government; DeRosa's counsel moved for continuance claiming surprise, that he had just received the details of Villalobos's interview and needed additional time to obtain information to rebut Villalobos's statements. The district court denied his request.

DeRosa contends that he was prejudiced by the denial of his continuance request because additional time would have permitted him to learn of Villalobos's prior felony drug record, and his history of drug smuggling and committing perjury. We find this argument to be without merit. DeRosa had five days to investigate Villalobos after learning of the possibility that Villalobos would enter into a plea agreement with the government. Considering the overwhelming evidence of guilt presented, the denial of DeRosa's motion for continuance did not severely prejudice his defense.

D.  FAILURE TO DISCLOSE EVIDENCE

DeRosa next complains that the government withheld information from him concerning Villalobos's criminal history in violation of *Brady v. Maryland*.[13]  *Brady* provides that a defendant is entitled to have the government disclose evidence favorable to him, including evidence useful to the defendant for impeachment purposes.[14]  Evidence subject to this rule must be favorable to an accused such that, had it been disclosed to the defense, the result of the proceeding would have been different.[15]  We review alleged *Brady* errors *de novo*.[16]

DeRosa contends that, during the pendency of this appeal, he uncovered evidence never disclosed to him by the government showing that at least five felony drug counts pending against Villalobos were dismissed in exchange for his testimony against previous co-indictees and that he perjured himself.  The record fails to show that the government withheld the information from DeRosa.  Further, even if DeRosa's claims that the government withheld this information were true, there was no violation of *Brady* because the information which DeRosa seeks to include was cumulative of DeRosa's admissions on the witness stand to two previous drug convictions and to a sentencing deal in this case.  Additional fodder for impeachment would not likely have changed the outcome of this trial.

---

[13]  373 U.S. 83, 83 S.Ct. 1194 (1963).

[14]  *See Green*, 46 F.3d at 464 (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380(1985)).

[15]  *See id.* (relying on *Bagley*).

[16]  *See United States v. Green*, 46 F.3d 461, 464 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S.Ct. 2629 (1995).

E.  ADMISSION OF CO-CONSPIRATOR STATEMENT

DeRosa and Lipari argue that the district court erred by permitting Officer William Bussey to testify about Coplin's post-arrest statements. As neither DeRosa nor Lipari objected to this testimony at trial, we review for plain error.[17]

They argue that because the sole purpose of Officer Bussey's testimony was to bolster Coplin's testimony, its introduction, coupled with the testimony elicited from Officer Shankles, constituted plain error in that it seriously impaired DeRosa's right to a fair trial.

Coplin testified that after his arrest, he told Officer Bussey the details of his involvement in the conspiracy. When DeRosa's counsel cross-examined Coplin about his post-arrest statements to Officer Bussey, he asked Coplin several times whether Coplin had omitted information in his post-arrest statements. Later in the trial, Officer Bussey testified for the government:

Q.  Do you recall specific details that you talked about with Mr. Coplin?

A.  Yes, sir, I do.

Q.  You heard his testimony earlier, is there anything significant that was different from your earlier conversations with him?

A.  No, sir, I can't think of anything offhand that was different than what he had initially told me.

This is the testimony about which they complain. Their complaint is without merit.

The defense "opened the door" to this inquiry by cross-examining Coplin about the content of his post-arrest statements in an effort to impeach him. The government was entitled to

---

[17]     *See Beaumont,* 972 F.2d at 95. DeRosa did not object to the introduction of co-conspirator statements at trial.

rehabilitate Coplin's testimony by eliciting corroborating testimony from Officer Bussey. The district court did not err by permitting this testimony.

### F. INEFFECTIVE ASSISTANCE OF COUNSEL

DeRosa raises his ineffective assistance of counsel claim for the first time on appeal. Claims alleging ineffective assistance of counsel cannot be resolved on direct appeal unless the defendant has adequately raised the issue in the district court.[18] Exception to this rule is made only if the record is sufficiently developed with respect to the merits of the ineffectiveness claim.[19] The record is not sufficiently developed in regard to DeRosa's claim, and we, therefore, will not review it. DeRosa remains free to pursue this ineffective assistance of counsel claim in accordance with 28 U.S.C. § 2255.[20]

### G. SENTENCING

Both DeRosa and Lipari complain regarding the calculation of their sentences.

1. DeRosa

Based on the recommendation made by the U.S. Probation Office in its Pre-Sentence Investigation Report ("PSI"), the district court found that DeRosa acted as a manager or supervisor of the conspiracy and increased his offense level by three points under § 3B1.1(b) of the Guidelines. DeRosa contends that his role in the conspiracy was not significant enough to be characterized as that of a manager or supervisor.

---

[18]    *See United States v. Wallace*, 32 F.3d 921, 930 (5th Cir. 1994).

[19]    *See United States v. McCaskey,* 9 F.3d 368, 380 (5th Cir. 1993), *cert. denied,* ___ U.S. ___, 114 S.Ct. 1565 (1994).

[20]    *See Wallace,* 32 F.3d at 930.

11

We review the district court's factual determinations under the Guidelines for clear error.[21] A finding of fact is not clearly erroneous if it is plausible in light of the record viewed in its entirety.[22]

> In determining whether a defendant played a supervisor/manager role in an offense, a court should consider such factors as the exercise of decision-making authority, the degree of participation in planning or organizing the offense, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Application note 3.

The evidence presented at trial established, at a minimum, that DeRosa was responsible for the decision to use the horse trailer to transport the marijuana, recruited Lipari into the conspiracy, hosted a preliminary meeting at his home during which he explained the details of the drug transportation scheme to Coplin, called Coplin to inform him when the time had come for Coplin to drive to Texas, introduced Coplin to Villalobos and reassured Villalobos of Coplin's trustworthiness, was contacted by Villalobos and Coplin while they were in Texas and was to be contacted again when Coplin arrived in Michigan with the drug load, and paid to fly Sherrie to Texas. In light of the evidence, the district court's finding that DeRosa was a supervisor or manager is not clearly erroneous.

---

[21] *See United States v. Liu*, 960 F.2d 449, 456 (5th Cir.), *cert. denied*, 506 U.S. 957 (1992).

[22] *See U.S. v. Sherrod*, 964 F.2d 1501, 1506 (5th Cir.), *cert. denied*, 506 U.S. 1041 (1993).

2.    <u>Lipari</u>

Lipari argues that the district court erred in not finding that he was entitled to reduction under § 3B1.2 for having minor or minimal role in the conspiracy.[23]  His argument is without merit.

The Guidelines define a minimal participant as one who is "plainly among the least culpable of those involved in the conduct of a group," as indicated by "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others."[24]  Lipari was not a minimal participant.  He was fully aware of the drug transportation scheme in which he participated.  By his own admission to Officer Shankles, he knew that the plan was to transport contraband from Texas to Michigan, and he knew that the contraband to be transported was marijuana.

Under the Guidelines, a minor participant is defined as one who is "less culpable than most other participants, but whose role could not be described as minimal."[25]   "It is improper for a court to award a minor participation adjustment simply because a defendant does less than the other participants.  Rather, the defendant must do enough less so that he at best was peripheral to the advancement of the illicit activity."[26] The district court's finding that Lipari was not merely a "minor"

---

[23]    Under § 3B1.2, a defendant's offense level can be reduced by four levels "[i]f the defendant was a minimal participant in any criminal activity," and by two levels "[i]f the defendant was a minor participant in any criminal activity."  U.S.S.G. § 3B1.2(a),(b) (West 1995).  In cases falling between minor and minimal involvement, the reduction is by three levels.  *See id.*

[24]    Section 3B1.2(a), Application Note 1.

[25]    Section 3B1.2, Application Note 3.

[26]    *United States v. Thomas*, 932 F.2d 1085, 1092 (5th Cir. 1991), *cert. denied*, 502 U.S. 1038 (1992).

participant is supported by the record. Lipari recruited Coplin into the conspiracy and provided the conspiracy with the use of the horse trailer. It cannot be said that Lipari was at best peripheral to the advancement of the conspiracy. The district court's finding is not clearly erroneous.

Lipari argues also argues that the district court made two legal errors in applying § 3B1.2 of the Guidelines. We review alleged legal errors in the application of the Guidelines *de novo*.[27] Lipari asserts that the district court (1) may have erroneously believed that a downward adjustment was not allowed in cases of drug possession and (2) impermissibly considered Lipari's previous criminal record as a basis for denying him minor role status.

Lipari's claims have no merit. First, although the district judge stated that she was unsure whether a minor role adjustment was permissible in cases of drug possession, she asked both the government and Lipari whether her assessment of the law was correct. Both Lipari and the government assured the court that a downward adjustment would be permissible. Second, as discussed *supra,* the district court did not err in refusing to find that he played a minor role in this offense.

Finally, Lipari argues that the district court erred by failing to make express findings as to the amount of marijuana for which he should be held accountable. Lipari's PSI computed his base offense level at 26, reflecting at least 100 but less than 400 kilograms of marijuana. The sentencing court adopted the findings in Lipari's PSI without objection; we, therefore, review for plain error.[28]

---

[27]     *See United States v. Edwards*, 65 F.3d 430, 432 (5th Cir. 1995).

[28]     *See United States v. Navejar*, 963 F.2d 732, 734 (5th Cir. 1992).

"Questions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error."[29]  In the absence of any objection, the district court was permitted to adopt the recommendation of the probation officer in the PSI and did not err in so doing.  The evidence indicated that it was reasonably foreseeable to Lipari that 300 pounds of marijuana could be involved in the conspiracy.

## CONCLUSION

For the foregoing reasons, the convictions and sentences of both appellants are **AFFIRMED.**

---

[29]  *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.), *cert. denied*, 500 U.S. 924 (1991) (relying on *United States v. Mourning,* 914 F.2d 699, 703 (5th Cir. 1990)).